CHARLES G. MEINKEN and Another, as Surviving Executors, etc., of HENRY MEINKEN, Deceased, Respondents, *v.* ISAAC LEVINSON and Others, Copartners, Engaged in Business under the Firm Name and Style of KAYELL SANITARY WIPING MATERIAL COMPANY, Appellants. (Action No. 1.)

CHARLES G. MEINKEN and Another, as Surviving Executors, etc., of HENRY MEINKEN, Deceased, Respondents, *v.* ISAAC LEVINSON and Others, Copartners, Engaged in Business under the Firm Name and Style of KAYELL SANITARY WIPING MATERIAL COMPANY, Appellants, Impleaded with GEM PAPER BOX COMPANY, Defendant. (Action No. 2.)

First Department, November 17, 1933.

*Abraham L. Sainer* of counsel [*Harry Dimin* with him on the brief; *Julius Horwitz*, attorney], for the appellants.

*Walter R. Herrick* of counsel [*Tomlinson, Herrick & Hoppin*, attorneys], for the respondents.

O'MALLEY, J. The judgments appealed from impose liability upon the appealing defendants in excess of $33,000. Such liability is predicated upon a finding that the appellants failed to perform their obligations as lessees under two written leases between themselves and the plaintiffs, their lessors.

The judgments are attacked upon the ground that upon all the evidence, and more particularly upon that introduced by the plaintiffs themselves, the defendants were not shown to have breached any covenants in their leases required to be performed by them. It is urged, therefore, that not only should the complaints have been dismissed, but that judgment on the counterclaims should have been granted to the defendants. Our conclusion is that the appeal is well taken and that any judgments in favor of the plaintiffs were unwarranted. Later consideration will be given to the counterclaims interposed.

The plaintiffs held a ground lease of the building known as Nos. 428–430 West Fourteenth street and 427–429 West Thirteenth street in the city of New York. It is a five-story non-fireproof building occupying the easterly side of Washington street between West Thirteenth and West Fourteenth streets. On March 6, 1924, plaintiffs leased direct to the appealing defendants from April 1,

1924, to April 30, 1927, the southerly loft on the fourth floor; and on the same day the defendants took by assignment, with the consent of the plaintiffs, a lease formerly made by the plaintiffs to Joseph Weinberger and John W. Thompson, covering the southerly half of the third floor which was for the period between March 1, 1924, and April 30, 1927. The leased premises in question will be referred to herein as being located on the third and fourth floors, respectively, although in the evidence the third floor is sometimes referred to as the second.

Both leases imposed upon the defendants certain obligations which it is claimed they failed to discharge. Pertinent provisions of the leases will be quoted. The lease made direct to the defendants provided:

" *3rd.* That the Tenants shall promptly execute and comply with all statutes, ordinances, rules, orders, regulations and requirements of the Federal, State and City Government and of any and all their Departments and Bureaus applicable to said premises, for the correction, prevention, and abatement of nuisances or other grievances, in, upon or connected with said premises during said term; and shall also promptly comply with and execute all rules, orders and regulations of the New York Board of Fire Underwriters for the prevention of fires, at their own cost and expense. There are no present violations on the demised premises."

The assigned lease contained a similar provision, as follows:

" *Eighth.* The tenant shall promptly execute and comply with all statutes, ordinances, rules, orders, regulations and requirements of the Federal, State and City Government and of any and all their Departments and Bureaus, applicable to said demised premises, for the correction, prevention, and abatement of nuisances or other grievances, arising on or after March 1, 1924, in, upon or connected with said premises during said term; and shall also promptly comply with and execute all rules, orders and regulations of the New York Board of Fire Underwriters for the prevention of fires, at his own cost and expense."

It is to be observed that the latter lease contained a recital to the effect that there were no present violations on the building. A similar recital was contained in the writing whereby the second lease was assigned to the plaintiffs.

On July 16, 1925, an order of the Supreme Court of New York county was obtained on the application of the fire commissioner of the city of New York, which directed the removal of all persons from the second, third, fourth and fifth floors of plaintiffs' building, and also directed the fire commissioner to prohibit their further use and occupancy except for the purpose of removing their con-

tents. Among the papers upon which this application was granted was an order made by the fire commissioner on February 6, 1925. This recited that conditions existing on the floors in question were eminently dangerous to life; that an emergency existed which required that the building be vacated above the first story and directed that the plaintiffs vacate the second, third, fourth and fifth floors by noon of February 11, 1925. Plaintiff's appeal from this order, taken on February 10, 1925, was denied by the board of standards and appeals on April 28, 1925.

The verdict upon which the judgments were entered imports a finding that the defendants were responsible for the orders which resulted in the vacating of the building to the extent indicated. The damages in action No. 1 represent the plaintiffs' alleged losses under the two leases, through which the defendants held possession of the southerly loft on each of the third and fourth floors. The judgment in action No. 2 represents damages resulting from the alleged loss which plaintiffs sustained in losing the benefits of a lease of the northerly half of the third loft. To this latter lease the defendants were not parties.

The question presented, therefore, is whether the defendants were responsible for the vacating order, or whether, as contended by their counsel, the whole fault lay with the plaintiffs. Defendants' counterclaims were predicated on their claim of fault on plaintiffs' part, which resulted in the loss to the defendants of their leases, and additional loss of property rendered useless, when the defendants were required to vacate. They also sought to recover a sum deposited as security. The determination of the question requires a full and complete consideration and analysis of the evidence, both oral and documentary.

Some four years prior to the date of the defendants' leases, a violation had been filed against the plaintiffs' building. By order No. 8491F of the fire commissioner of the city of New York, July 8, 1920, the plaintiffs were directed to install an automatic sprinkler system throughout the building. Such requirement, of course, was for the purpose of providing more adequate fire protection. The plaintiffs avoided compliance with this order by securing on May 15, 1923, a modification, on appeal to the board of standards and appeals. This order, after reciting that it was contended on behalf of the plaintiffs that there was no hazardous occupancy and that as the building faced on two streets, there was ample means for fighting fire, reads: " Resolved that the order of the fire commissioner be and it hereby is modified and the appeal be and it hereby is granted on condition that a thermo-

static fire alarm system connected with Central Office, be installed throughout the building, that the allowable, posted floor load shall not be exceeded at any time and granted only so long as the occupancy and use remain unchanged.''

It is conceded that the plaintiffs complied with this order to the extent of installing a fire alarm system, and it is asserted on their behalf that all conditions imposed were fully met, and that at the time the defendants took possession there were no violations on the building. Defendants, on the other hand, contend that '' occupancy and use '' did not remain unchanged, nor was the '' posted floor load '' requirement observed.

However this may be, it appears that after the defendants took possession, and on June 9, 1924, the fire commissioner again directed the installation of a sprinkler system, as required by the original order of July 8, 1920, and following this and on April 28, 1925, the board of standards and appeals rescinded its order of May 15, 1923, which granted the appeal, and affirmed the original order of the fire commissioner and denied the appeal.

It is now necessary to consider the theory upon which the plaintiffs' cause of action is framed and the breach of obligation charged by the plaintiffs against the defendants. It is essential, also, to consider the actual cause or reasons which induced the fire commissioner to issue anew his order for the installation of the sprinkler system, which resulted, as it did, in the order of the board of standards and appeals in rescinding its modification order of May 15, 1923. If the order of the fire commissioner and the rescinding order of the board of standards and appeals were predicated upon violations for which the plaintiffs and not the defendants were responsible, then it naturally follows that the defendants may not be mulcted in damages.

The complaint in action No. 1 charged the defendants with failure to comply with the order of May 15, 1923, in that they overloaded the floors in violation of the '' posted floor load '' provision in such order, and that in consequence, the bureau of fire prevention of the city of New York issued an order directing that the premises occupied by the defendants be vacated. After alleging that plaintiffs' appeal from such order was denied, it charges that the board of fire prevention secured the Supreme Court order which directed that the premises occupied by the defendants be vacated; that the vacating of said premises was not caused by any fault on the plaintiffs' part, but was due to the defendants' fault, in not complying with orders of the municipal departments of the city of New York, and more particularly the order of the board of standards and appeals '' hereinbefore referred to,'' namely, the

order of May 15, 1923. The liability of the defendants in action No. 2 is predicated upon precisely the same violation of duty. No other ground of liability is contained in the complaint.

Two questions naturally suggest themselves: Was the vacating order issued because of overloading of the floors in the southerly portion of the second and third floors occupied by the defendants? If so, was such order limited only to such parts of the whole building as was occupied by the defendants?

Answering the second question first, it already appears that the order directed that all four floors above the first be vacated. Of this entire space, the defendants occupied only a fourth. As to the first question, it appears beyond any question that the order was not issued because of overloading by the defendants — a mere incidental cause among many — but that the order was issued because the building as a whole was a fire trap and was maintained by the plaintiffs in open violation of law and in practical defiance of the city authorities.

As to the overloading with respect to the southerly portions of the third and fourth floors, it is true that an inspector of the bureau of buildings on March 25, 1924, reported that the " safe posted floor load " of seventy pounds on these floors was exceeded. He, therefore, recommended that the building must be taken down or removed unless the existing floor loads be reduced so as not to exceed the posted floor load; and notice to this effect was given to the plaintiffs on the same day. Notice of such overloading and of the filing of an unsafe order was given to the bureau of fire prevention of the fire department by the superintendent of buildings on March 26, 1924. It further appears that this notice was not complied with by the plaintiffs.

It is contended in their behalf that the duty of remedying this condition rested upon the defendants and that the latter were notified shortly after the receipt of the notice that they would be expected to comply. Defendants denied having received such notice or request from the plaintiffs. It is to be observed that this violation was filed only twenty days after defendants' leases were made and at a time when the defendants had not taken full possession of the premises but were preparing the floors for occupancy which occurred about April 1, 1924.

However this may be, it is to be noted that the violation and order of the superintendent of buildings were not made a part of the moving papers upon which the court order directing that the premises be vacated was secured. It is not referred to therein, such order having been procured and made upon wholly different grounds and for entirely different reasons, as will presently appear.

But assuming for the moment that on the floors occupied by the defendants overloading was the basis of the court order, it is interesting to observe that the greater part of the overweight was upon the third floor before the defendants obtained their leases, and had been maintained thereon for at least two years by former tenants of the plaintiffs who had conducted a wet wash laundry. This overweight consisted in part through the maintenance of a concrete slab or platform raised about a foot above the floor level and some twenty-five by seventy-five feet in dimension. The witness Clifford, an engineer of the bureau of buildings, plaintiffs' own witness, testified that this structure in itself exceeded the posted floor load by ten pounds to the square foot. The only additional weight charged to defendants in connection with this platform was the filling of water vats which were on the platform. However, these vats were on the platform and were used by the former tenant; and defendants denied ever having completely filled them. Defendants were also charged with having placed heavy bales of rags on the floor. Their business consisted of washing rags and material preparatory to converting them into wiping material. Their evidence on the other hand tended to show not only that they were not guilty of overloading, but that they in fact reduced the floor weight on the third floor five and one-half tons from what it was when they took possession.

Moreover, there was evidence of overloading on the sixth floor by a tenant known as the Gem Box Company. This overloading was found to exist on April 19, 1924, in a report made by Inspector Gavan, of the bureau of fire prevention, who at the same time reported that the modification order of May 15, 1923, had not been complied with by plaintiffs on the fifth floor, " where there are 56 persons employed; modification calls for 33." This report continues: " I met the representative of the estate who was on premises, who own property and he seems to think it is a matter for this Bureau to adjust the matter with the tenants as he stated he would not ask any man to sign a lease limiting him to 33 persons still he has taken advantage of the modification. With exits not up to requirements, nature of occupancy, laundry, paper box mfg., cold storage system, and no spk. system I believe a vacate order should be got out against the Bldg."

This same inspector, in a further report on the whole building, made on May 15, 1924, stated: " The decision of the Board of Standards and Appeals on the appeal from sprinkler order has been ignored both as to number of persons employed and the over-loading of floors for two years." This report was introduced as plaintiffs' Exhibit 7.

As to further change of occupancy by the plaintiffs after May 15, 1923, it appears that the second floor, described in the modification order as being occupied for hotel supplies and marbling paper, was shown in the petition of the fire commissioner upon which the court order was secured, as being occupied on the north side in part as a cold storage plant and on the south for sorting rags and the storing of loose and baled rags. So, too, whereas the resolution of modification of May 15, 1923, described the fourth floor as occupied at that time for " laundry and mirrors," the petition of the fire commissioner indicated that the floor was occupied by two separate and distinct laundries.

It is manifest, therefore, that the plaintiffs themselves had not complied with the modification order of May 15, 1923, either as to overloading or occupancy. Rescission of the modification order of the board of standards and appeals, therefore, was warranted, because of plaintiffs' failure to comply with its terms.

But, as already noted, the court order which directed vacation of the premises was secured for reasons other than overloading or change of occupancy. It in no way refers to any condition of overloading of any of the floors in the building, but recites that " a condition eminently perilous to life and property exists on the second, third, fourth and fifth floors of said premises and that it is inadequately protected against fire perils and that the said condition constitutes a menace to the occupants of said floors as well as to the occupants of adjoining premises."

While it is true that the petition of the fire commissioner charged an overloading on the third floor, it also charged a violation of the modification order of May 15, 1923, " as to the number of persons permitted to be employed on the fourth and fifth floors." The petition recites the issuance of the order of June 9, 1924, requiring the installation of a fire sprinkler system; the issuance of the order of February 6, 1925, which recited that conditions on the second, third, fourth and fifth floors were " eminently dangerous to fire, and that an emergency exists requiring that building be vacated above the first story; " the rescission by the board of standards and appeals on April 28, 1925, of its modification order of May 15, 1923. It also recites the denial of plaintiffs' appeal from the order of February 6, 1925, and charges non-compliance by the plaintiffs with orders of June 9, 1924, and of February 6, 1925. It further recites conditions existing on all four floors.

On the fifth floor, occupied for the manufacture of paper boxes, there was maintained a great quantity of highly combustible material which was unprotected from an open gas flame, and

further, aisles were not maintained to enable persons to escape in case of fire. On the northerly side of the fourth floor, where the business of laundering new shirts and collars by hand was being conducted, the particular hazard described was due to wooden dryers therein maintained, heated by light steam and high pressure, resulting in a heat of great intensity, and which were inadequately protected from fire " as there is no retardant under the light metal floor covering, and another serious fire hazard is that proper stands are not provided for the irons on the ironing tables, and the woodwork of these tables is consequently burned and charred to a depth of one-half an inch, and in some places beneath these tables the floors are not covered with any fire retarding material whatever."

The third floor on the north side was occupied as a paper cutting department by a concern that conducted a box manufactory on the fifth story. Overloading of this floor is charged and the arrangement of the piling of packages was described as constituting " an extremely dangerous fire hazard; that aisle space was not maintained, and a large amount of cardboard ·and paper clippings was on the floor in bales and in uncovered receptacles unprotected from the gas flame at the nearby strippers."

The second floor on the north side is described as being occupied as an office and cold storage plant. It is charged that the hazard in this portion of the building was of a cumulative character due to the possible explosion of an ammonia refrigerating system.

The portions of the premises thus far described were not occupied by the defendants, and for the conditions existing therein the defendants, of course, could not in any way be held responsible. It is true that the petition also described conditions existing in the portion of the buildings occupied by the defendants as also constituting a fire hazard. But, except in so far as already appears, no charge of overloading on the defendants' floors was made.

It is further alleged in the petition that independently of the fact that the order requiring the installation of an automatic sprinkler system had not been complied with, that, in the opinion of the fire commissioner the premises in question (referring to second, third, fourth and fifth floors) are in his opinion " inadequately protected against fire perils, and that it, therefore, constitutes a constant menace to the lives of the persons employed therein and to the occupants of the adjacent buildings."

It is further alleged that the order requiring the installation of the automatic sprinkler was issued for the purpose of minimizing the fire hazards, but that in no sense was it " considered fully adequate to remedy the danger existing therein."

Attached to and made a part of the petition are verified detailed

reports of three inspectors of the bureau of fire prevention made July 14, 1925, which show in detail the conditions existing on all floors throughout the building. Without specifying in detail the facts contained in these reports, suffice it to say that they show a non-fireproof building, old, deteriorated and in bad repair throughout. There was a complete absence of fire retardant. The stairways were non-fireproof; the halls from the terminating of the stairways to the street were not fireproof. The ceilings of the stair hall on the fourth floor were not fireproof and the fire escapes all around the building were insufficient. The shafts were not protected against fire and the shaft ventilators were not satisfactory, and unprotected gas lights were found throughout the building.

It is obvious, therefore, from this documentary evidence which was introduced as a part of plaintiffs' own case and which was made the basis of the court order requiring the floors of the building above the ground floor to be vacated, that such order issued not because of overloading by the defendants, but because the building was a fire trap and eminently dangerous to life.

Certainly the defendants were under no obligation to install a sprinkler system throughout the entire building as required by the order of June 9, 1924. Nothing in their leases extended their obligations towards the plaintiffs beyond the portions of the building occupied by them. It is obvious that the conditions complained against by the fire commissioner and made the basis of the order requiring the premises to be vacated pertain to all floors above the first. To remedy some of these serious conditions, substantial structural changes were required, for which these defendants, even if lessees of the whole building, would not have been responsible. Fire hazards which existed in portions of the premises of the building otherwise demised were no concern of the defendants. (*Second U. C . R. Corp.* v. *Price & Schumacher Co.*, 242 N. Y. 120; *Cohen* v. *Margolies*, 192 App. Div. 217, 219; *Younger* v. *Campbell*, 177 id. 403.)

We now come to a consideration of defendants' counterclaims. It seems to us that the first and fourth are predicated upon plaintiffs' breach of an express warranty that no violations existed when the defendants' leases were made. Defendants assert that this warranty or representation was false and that there was a fraudulent concealment of true conditions by the plaintiffs which entitled the defendants to actual damages. (*Ash* v. *Meeks*, 134 App. Div. 154; *Daly* v. *Wise*, 132 N. Y. 306.) However, defendants must recover, if at all, upon the theory pleaded.

In our opinion the defendants failed to establish facts entitling

them to a recovery on these two counts under the principle of the authorities cited. The representations that there were no present violations on the building were not false, but true in fact. All the violations theretofore existing had been removed by the modifying order of May 15, 1923. It is true that plaintiffs failed to comply with the conditions upon which the modification had been secured. However, subsequent violations, though predicated upon pre-existing conditions, would not be a misrepresentation. The defendants, when they entered into their leases, were charged with notice that later violations might be filed, even with respect to pre-existing conditions. (*Duhain* v. *Mermod, Jaccard & King J. Co.*, 211 N. Y. 364.)

As to the second counterclaim, this seeks an abatement of the rent paid in advance for the month of July, 1925. We are of opinion that the defendants were entitled to such relief from the date of eviction, July 18, to July 31, 1925, in the sum of $311.

The third counterclaim seeks to recover the sum of $200 deposited with the plaintiffs as security for the performance of the leases. As we have already found that the eviction was due to the fault of the plaintiffs and not to any fault on the part of these defendants upon this record, the latter were entitled to the recovery of the amount deposited for security, no breach of the agreements on their part having been shown.

It follows, therefore, that the judgments appealed from should be reversed, with costs, and the complaints dismissed, and judgment granted in favor of the defendants upon their counterclaims to the extent indicated, with costs.

FINCH, P. J., MERRELL, MARTIN and UNTERMYER, JJ., concur.

Judgments reversed, with costs, and complaints dismissed, and judgment granted in favor of the defendants upon their counterclaims to the extent indicated in the opinion, with costs. Settle order on notice.